# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DAWN HOPKINS,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:07-cv-964
Beckwith, J.
Hogan, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pro se pursuant to 42 U.S.C. § 405(g) for judicial review of the

final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's

applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).

This matter is before the Court on plaintiff's statement of errors (Doc. 8), and the

Commissioner's memorandum in opposition. (Doc. 10). For the reasons that follow, the Court

recommends that the decision of the Commissioner be reversed.

## PROCEDURAL BACKGROUND

Plaintiff was born in 1966, has a high school education, and past work experience as a

receptionist, administrative assistant/secretary, legal assistant, and server. Plaintiff filed

applications for DIB and SSI in September 1999 and June 2000 respectively, alleging disability

since December 1997 due to multiple sclerosis and fibromyalgia. Plaintiff's insured status for

DIB purposes expired on June 30, 2000. (Tr. 444). Plaintiff's applications were denied initially,

upon reconsideration, and after a hearing before the ALJ. The Appeals Council denied plaintiff's

request for review and plaintiff filed a complaint in the United States District Court for the

Southern District of Indiana. On February 25, 2004, the Indiana District Court determined the

ALJ's decision was not supported by substantial evidence and remanded for further proceedings pursuant to Sentence Four of Section 405(g). (Tr. 416-423).

On February 8, 2006, a second hearing was held before ALJ James Norris at which plaintiff was represented by counsel. (Tr. 380-415). Two medical experts and a vocational expert also appeared and testified at the hearing. *Id.*

On May 4, 2006, the ALJ issued a decision again denying plaintiff's DIB and SSI applications. The ALJ determined that plaintiff suffers from severe impairments of fibromyalgia, multiple sclerosis, and cervical degenerative disc disease, and nonsevere impairments consisting of depression and a history of kidney stones. (Tr. 343). The ALJ found plaintiff's impairments do not meet or equal the Listing of Impairments. (Tr. 345). According to the ALJ, plaintiff retains the residual functional capacity (RFC) for a full range of sedentary work, including lifting no more than ten pounds at one time, sitting for six hours in an eight hour workday, and walking and standing for two hours in an eight hour workday. (Tr. 345). Given these limitations, and based on the testimony the vocational expert, the ALJ determined that plaintiff could perform her past relevant work as a secretary as it was performed in the national economy. (Tr. 353). The ALJ further determined that even if plaintiff was unable to perform her past relevant work as a secretary, she would be found not disabled based on Grid Rule 201.29 for sedentary work. Consequently, the ALJ concluded that plaintiff is not disabled under the Act, and therefore not entitled to DIB or SSI. Plaintiff's appeal to the Appeals Council was denied, making the ALJ's decision the final decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

2

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).
The Court's sole function is to determine whether the record as a whole contains substantial
evidence to support the Commissioner's decision. The Commissioner's findings stand if they are
supported by "such relevant evidence as a reasonable mind might accept as adequate to support a
conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v.
N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are
supported by substantial evidence, the Court must consider the record as a whole. *Hephner v.
Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status
requirements, be under age 65, file an application for such benefits, and be under a disability as
defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is
contingent upon two findings. First, plaintiff must suffer from a medically determinable physical
or mental impairment that can be expected to result in death or that has lasted or can be expected
to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the
impairments must render plaintiff unable to engage in the work previously performed or in any
other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible
individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is
dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To
establish disability, plaintiff must demonstrate a medically determinable physical or mental
impairment that can be expected to last for a continuous period of not less than twelve months.
Plaintiff must also show that the impairment precludes performance of the work previously done,

3

or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by

4

showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). If a treating

5

physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004); *Walters*, 127 F.3d at 530. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). In weighing the various opinions and medical evidence, the ALJ must consider other pertinent factors such as the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's supportability by evidence and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6); *Wilson*, 378 F.3d at 544. In terms of a physician's area of specialization, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

6

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL EVIDENCE

In July 1999, plaintiff began seeing rheumatologist Myron Chu, D.O., for complaints of muscle aches and fatigue. (Tr. 184-89). On examination, she had good range of motion of the neck, shoulders, elbows, wrists, and hands, and no synovitis or effusions were noted. (Tr. 186). She had good range of motion of the lower extremities. (Tr. 186). She had no muscle atrophy, and her neurological examination was normal. (Tr. 186). Dr. Chu's impression was a symptom complex of arthralgias, myalgias, disturbed sleep cycle, and daytime fatigue with numerous tender points consistent with a diagnosis of fibromyalgia. (Tr. 187). Dr. Chu also assessed osteoarthritis of the knees and depression which was likely related to her fibromyalgia symptoms. (Tr. 187).

In September 1999, plaintiff was hospitalized after a suicide attempt. (Tr. 136). Dr. Paul Riley diagnosed a panic disorder and recurrent major depressive disorder and assessed a GAF of 35. (Tr. 136). He noted that Prozac was not working and prescribed Zoloft. (Tr. 141). A reviewing state agency physician opined that given plaintiff's recent suicide ideation and hospitalization, her condition "can not be non severe." (Tr. 167).

In an examination on October 6, 1999, plaintiff had no trouble getting on or off the examination table, normal gait and posture, normal range of motion of all joints, no sign of any joint effusion or inflammation, and a normal neurological examination. (Tr. 149). She did, however, have positive tender points diffusely. (Tr. 149). Her grip strength and fine finger manipulative abilities were normal. (Tr. 149). Plaintiff complained of abnormal sleep cycles. (Tr. 150). The doctor noted that plaintiff's signs and symptoms, as well as her associated complaints, were consistent with a diagnosis of fibromyalgia. (Tr. 150). An examination on

8

October 26, 1999, revealed no restriction of function in her upper and lower extremities (Tr. 154-55) and no evidence of muscle weakness or atrophy. (Tr. 155). She had some trigger points behind her neck, shoulders, and knees which were consistent with her diagnosis of fibromyalgia. (Tr. 155). She was taking an antidepressant and an anti-inflammatory for treatment. *Id*.

Plaintiff was seen in the emergency room for a kidney stone in December 1999. (Tr. 244).

Plaintiff returned to Dr. Chu on January 28, 2000. (Tr. 247-50). She reported less depression, but a significant amount of fibromyalgia pain, fatigue, and sleeplessness. (Tr. 247). She also reported some weakness, clumsiness, numbness, and tingling, especially in the right arm and some numbness in her legs. (Tr. 247). Plaintiff's neurological examination was normal. (Tr. 248). She had all fibromyalgia tender points. (Tr. 248). She had diminished grip on the right, but Dr. Chu thought it secondary to pain, rather than a manifestation of true weakness. (Tr. 248-49). Dr. Chu ordered a MRI of the cervical spine, which showed some arthritis and stenosis, but no nerve root impingement. (Tr. 252-53). An MRI of the lumbar spine showed no abnormalities of the lumbar discs and spinal canal. (Tr. 254). However, an MRI of the cervical spine revealed moderately severe left foraminal stenosis and left C5 nerve root impingement. (Tr. 252).

On March 2, 2000, Dr. Chu's examination revealed that plaintiff's tender points seemed to be the same, and that she experienced pain and stiffness with range of motion. (Tr. 212-213). A neurological examination was normal. (Tr. 213). The rheumatologist's impression was fibromyalgia which had not been responsive to traditional medications and degenerative changes at the cervical spine by MRI in which there was nerve root compression. (Tr. 213). Dr. Chu noted that plaintiff continued to follow with her psychiatrist for medication management. (Tr.

9

213).

Plaintiff was examined by Clinical Psychologist Roger Hofferth on March 13, 2000 at the request of the Administration. (Tr. 190). He diagnosed depression. (Tr. 193). A state agency reviewing psychologist opined that plaintiff was moderately limited in her ability to complete a normal workweek and to respond appropriately to changes in the work setting due to psychological symptoms (Tr. 195), but was capable of simple tasks. (Tr. 196). The psychologist noted that plaintiff had received counseling (*see* Tr. 215-219), was taking medication, and appeared credible. (Tr. 196).

Progress notes from plaintiff's family physician from August 2000 though February 2001 document complaints of increased muscle pain, sleeplessness, fatigue, memory loss, poor concentration, "electrical shocks thru arms & legs," numbness in her right side and legs, and weakness. (Tr. 278-287).

On January 26, 2001, plaintiff saw Eung-Jun Cha, M.D., for complaints of severe headaches, aching, and weakness involving multiple joints with pain especially on the right in the upper and lower extremities. (Tr. 204). Plaintiff stated that she could not sit for more than 10 minutes because her legs went numb and were weak. (Tr. 204). She had uncontrolled movements at night on the right. (Tr. 204). She had problems with her eyesight. (Tr. 204). On examination, plaintiff's gait was very unsteady and spastic, she had nystagmus in both eyes, and her right side upper and lower extremities showed diffuse weakness with increased reflex tone. (Tr. 204). The left side showed hyper-reflexia, although to a lesser degree. (Tr. 204). There was ankle clonus bilaterally, but worse on the right. (Tr. 205). Dr. Cha's impression was multiple

10

sclerosis (MS).[1] (Tr. 205). Dr. Cha subsequently reported that an MRI scan of the brain revealed abnormal lesions which were strongly suggestive of MS. (Tr. 206). Dr. Cha diagnosed MS and suggested that plaintiff see a neurologist. (Tr. 206-08).

On August 7, 2001, plaintiff saw neurologist David Mattson, M.D., Ph.D., the Director of the MS Center at Indiana University in Indianapolis. (Tr. 294-96). Plaintiff indicated that two weeks earlier, she had an episode of more discrete numbness in the right leg, right arm, and then left leg, which lasted for two weeks and was currently improved. (Tr. 294). On examination, plaintiff had no nystagmus or other opthalmologic findings, normal muscle tone, and no clonus in either ankle. (Tr. 295). She had mild give-way on strength testing, but 5/5 or 4+/5 strength in the muscle groups in her arms and legs. (Tr. 295). Sensation was decreased in the right arm and leg. (Tr. 295). Her gait and reflexes were normal. (Tr. 295). Dr. Mattson diagnosed relapsing-remitting multiple sclerosis. (Tr. 295). He reassured plaintiff that her examination looked good and that the current episode should resolve, but it may take 6 to 12 months to assess the full extent of recovery. (Tr. 295). Dr. Mattson advised avoiding narcotics to prevent rebound headaches and prescribed Neurontin for neuropathic pain and as a headache prophylaxis. He recommended weekly shots of Avonex as maintenance immunotherapy to decrease future MS activity. (Tr. 296).

On August 7, 2001, Dr. Mattson completed a functional capacity assessment (FCE). (Tr. 291-93). He opined that plaintiff could sit, stand, and walk each for one-quarter hour continuously; stand and walk each for less than one hour total in a workday; sit for a total of four

---

[1]Multiple sclerosis is a slowly progressive central nervous system disease characterized by disseminated patches of demyelination in the brain and spinal cord, resulting in multiple and varied neurologic symptoms and signs, usually with remissions and exacerbations. The Merck Manual, 17 ed. (1999) at 1474.

11

hours in a workday; and lift five pounds frequently and 10 pounds occasionally. (Tr. 291). She

could occasionally bend and rotate her trunk, kneel, extend her arms out, and flex her neck; but

she could never squat, crawl, climb, and reach over her head. (Tr. 292). She had limitations in

using her hands for pushing/pulling arm controls or fine manipulation. (Tr. 292). She could not

use her feet frequently or continuously for repetitive movements. (Tr. 292). She was moderately

restricted from being around moving machinery and driving automotive equipment and totally

restricted from working at unprotected heights, being exposed to marked changes in temperature

or humidity, and from exposure to dust, fumes, and gases. (Tr. 292). In addition, plaintiff was

limited in her ability to concentrate on tasks and attend work, due to pain, abnormal sensations,

fatigue, and confusion/disorientation. (Tr. 293).

 Plaintiff returned to Dr. Mattson on October 5, 2001, complaining of occasional

migratory joint pains, paresthesias, fatigue, and her right leg giving out more over the last couple

of months, more in the last week and a half. (Tr. 531). Plaintiff reported ongoing background

fatigue and depression, which was worse despite Paxil 60 mg. (Tr. 531). She also reported fewer

headaches on her current dose of Neurontin. (Tr. 531). Plaintiff had been taking Avonex[2]

injections for the past three weeks, as well as Paxil, Neurontin and Vicodin for kidney stones.

(Tr. 531). Plaintiff's neurological examination was normal. (Tr. 531). She had 5/5 motor

strength throughout and her gait was normal. (Tr. 531). Dr. Mattson was unsure if plaintiff's

right leg giving out was a sign of a new attack or an increased awareness of her symptoms, due to

depression. (Tr. 531). He prescribed physical therapy to evaluate her need for a gait assistance

---

[2]"Avonex (Interferon beta-1a) is indicated for the treatment of patients with relapsing forms of multiple sclerosis to slow the accumulation of physical disability and decrease the frequency of clinical exacerbations." Physicians' Desk Reference, 58th ed. (2004), at page 973.

device. (Tr. 532).

In September 2002, plaintiff began treating with Dr. Rizvi at the Brightwood Medical Center. (Tr. 547). The progress notes reflect that plaintiff was a new patient with a "flare up of pain, depression, seasonal allergies, off all meds x [for] 1 1/2 mo's secondary to living in shelter [and] ⇓ finances." (Tr. 547). The doctor noted depression, insomnia, fatigue, anhedonia, and irritability. (Tr. 547). Plaintiff was assessed with multiple sclerosis, depression, and GERD with possible gastritis and her medications were refilled. (Tr. 547). The following month, plaintiff still complained of insomnia and reported that Zoloft was not effective. There was no change in her depression. (Tr. 546). Her medications were refilled. (Tr. 546).

In November 2002, Dr. Mattson talked to plaintiff about a deterioration in her MS, which he interpreted as an exacerbation involving a subacute gait deterioration. (Tr. 530). Plaintiff was given an oral course of Prednisone. Dr. Mattson then prescribed Rebif[3] injections, three times per week, in place of the Avonex injections in an effort to better control plaintiff's MS symptoms. (Tr. 459, 530).

In December 2002, Dr. Rizvi's progress notes show plaintiff reported "frontal band-like headaches that are throbbing/squeezing in nature" and "sleeplessness." (Tr. 544). On examination, Dr. Rizvi noted tenderness in the right trapezius and arm. (Tr. 544). Plaintiff was prescribed Bextra and Flexeril, and received refills on her other prescriptions. (Tr. 544).

Plaintiff followed-up with Dr. Mattson on January 7, 2003. (Tr. 459). He reported that plaintiff continued to be troubled by background headaches helped somewhat by Neurontin,

---

[3]"Rebif (interferon beta-1a) is indicated for the treatment of patients with relapsing forms of multiple sclerosis to decrease the frequency of clinical exacerbations and delay the accumulation of physical disability." Physician's Desk Reference (58th ed. 2004), at 3137.

13

background neuropathic pain helped somewhat by Flexeril and Bextra, and with mood troubles for which she was seeing a psychiatrist in ongoing care. (Tr. 460). He reported that plaintiff had recently been switched from Paxil to Zoloft with the addition of Tegretol for psychiatric purposes. (Tr. 460). Neurological examination was notable for bladder urgency, fatigue and Lhermittes phenomenon.[4] On exam, plaintiff's visual acuity was 20/20 OD, 20/25 OS, and she had no nystagmus; tone and strength were normal in the legs; there was no clonus at either ankle; and she walked with a slight left circumduction. (Tr. 460). Dr. Mattson's impression was relapsing-remitting multiple sclerosis, with some recent disease activity that resulted in a switch from Avonex maintenance immunotherapy to Rebif maintenance immunotherapy. (Tr. 460). Because plaintiff complained of some cognitive difficulties, Dr. Mattson referred her to David Kareken, Ph.D., for neuropsychological testing. (Tr. 460, 462).

On January 15, 2003, Dr. Kareken, Ph.D., administered a MMPI-II which was suggestive of profound depressive symptoms. Dr. Kareken opined that plaintiff's MS did not cause significant cognitive disturbance, but rather her forgetfulness and inattention were related to "marked symptoms of depression and anxiety." (Tr. 462). Dr. Kareken also noted that plaintiff was taking a large number of medications and could not rule out some sedative effects from the combination of her medications. (Tr. 462).

Plaintiff saw Dr. Rizvi on January 30, 2003 for pain in the left side of her forehead and face. (Tr. 541). Her prescriptions for Klonopin, Flexeril, and Celebrex were refilled, and she was prescribed Bextra, Erythromycin, Entex, and Tessalon. The progress note indicates plaintiff was

---

[4]Lhermitte's sign is defined as the development of sudden, transient, electric-like shocks spreading down the body when the patient flexes the head forward, seen mainly in multiple sclerosis. Dorland's Medical Dictionary, 27 ed. (1988) at 1524.

moving to a new area and would find a new doctor. (Tr. 541).

Progress notes from the Indiana Family Health Clinic in February 2003 show diminished strength in all extremities. (Tr. 521). In March 2003, when seen for a follow up on her MS, plaintiff reported she fell and hit her left side, right arm, and left knee and had difficulty breathing. (Tr. 519). She complained of weakness on her right side resulting in a fall. (Tr. 519). On April 9, 2003, plaintiff complained of pain in her spine, worse on ambulation. (Tr. 519). She also complained of problems sleeping. (Tr. 519). Progress notes from April 29, 2003 show plaintiff reported her legs giving out and getting progressively weak and falling frequently. (Tr. 515). She also complained of headaches and insomnia. On examination, muscle strength was diminished, worse on the left lower extremity. (Tr. 515). She was referred to Dr. Mattick, a neurologist, for an evaluation of her headaches. (Tr. 515).

Dr. Mattick examined plaintiff on May 22, 2003. (Tr. 512). Plaintiff complained of three types of headaches: migratory; ones that started in the occipital area and spread to the vertex which were severe and aching; and migraine headaches which were unilateral and throbbing. (Tr. 512). Dr. Mattick refilled her medications and prescribed Vicodin 5/500. (Tr. 513).

In August 2003, plaintiff reported her headaches were lately due to sinus problems. (Tr. 511). She was diagnosed with sinusitis, tension headaches, and insomnia. (Tr. 510). Later that month, she was again seen at the Clinic with headache pain and diagnosed with chronic migraine headaches and sinusitis. (Tr. 510).

On December 4, 2003, plaintiff was seen by primary care physician Shelly Rogers, M.D. (Tr. 506). Plaintiff presented with lower extremity pain, dizziness, lightheadedness, and a feeling of disequilibrium. Plaintiff's multiple sclerosis and headaches were assessed as stable. (Tr. 507).

On December 18, 2003, it was noted that plaintiff's headaches were improved on Neurontin and Imitrex. (Tr. 503). At that time, plaintiff's headaches and MS were again described as stable. (Tr. 504).

On January 2, 2004, plaintiff was examined at the St. Vincent Hospital Emergency Department for head trauma. (Tr. 716-726). Plaintiff experienced double vision, fell, and hit her head after her legs gave out. (Tr. 724, 725).

On February 5, 2004, Dr. Mattson reported that he had not seen plaintiff in a year, because she failed to make it to her July 2003 visit. (Tr. 458). He noted that plaintiff's year was going well "until the last couple of months, with no sense of MS attacks or progression and only occasional tendency to fall which had not increased." (Tr. 458). Dr. Mattson noted that within the last couple of month plaintiff had "increasing headaches that involve a left parietal/occipital pain with low-grade nausea, no vomiting, some photophobia and can be throbbing in nature." (Tr. 458). He further reported that plaintiff had ongoing fatigue and was increasingly depressed and emotionally labile on her current dose of Zoloft. It was noted that plaintiff "never did try physical therapy as previously recommended, but would like to try this now." (Tr. 458). On examination, plaintiff's visual acuity was 20/20 OD, 20/25 OS; there was no nystagmus; tone and strength were normal in the legs; there was no clonus at either ankle; and she had a normal gait. (Tr. 458). Dr. Mattson's impression was "[r]elapsing-remitting multiple sclerosis, with, to my mind, an overall stable MS course, and if anything, an actually improved exam. To me, this validates her Rebif maintenance immunotherapy" which Dr. Mattson recommended be continued. (Tr. 459). Plaintiff had a repeat MRI which showed scattered periventricular lesions without enhancement with imaging characteristics consistent with multiple sclerosis. (Tr. 458).

16

At an appointment dated March 11, 2004, the doctor assessed plaintiff's MS, kidney stones, and classical migraines as stable. (Tr. 498). Plaintiff underwent a hysterectomy in May 2004. (Tr. 566-663).

On August 16, 2004, Dr. Mattson stated that in the six months since he last saw plaintiff, things had been stable in terms of MS, with nothing suggestive of attacks or progression. (Tr. 334). Dr. Mattson reported that plaintiff continued to have occasional pains in the right side but these were stable in their occurrence and their difficulties. (Tr. 334). Plaintiff's major concern was increasing frontal throbbing or stabbing headaches associated with photophobia and nausea without vomiting which had been occurring daily for the last month and keep her awake at night. (Tr. 334). Her medications were mildly helpful. (Tr. 334). Plaintiff's neurological examination was normal. (Tr. 335). Dr. Mattson diagnosed relapsing-remitting MS with a stable clinical course. (Tr. 335). He continued plaintiff on Rebif. (Tr. 335). He thought the headaches had a migrainous component. (Tr. 335). Dr. Mattson adjusted her medications and noted that she was going to see her primary care provider about sinus difficulties, which could stir up migrainous tendencies. (Tr. 335). Her medications included Neurontin, Klonopin, Flexeril, Vicodin, Tegretol, Zoloft, Imitrex, and Rebif. (Tr. 334). Dr. Mattson noted that plaintiff continued with the Tylenol pre-medication regimen to decrease flu symptoms resulting from her three times per week Rebif injections.

On August 19, 2004, Dr. Mattson completed another FCE in which he opined that, due to MS, fatigue, and decreased stamina, plaintiff could occasionally lift and/or carry 10 pounds and frequently lift and/or carry less than 10 pounds; stand and/or walk less than two hours in a workday and sit less than six hours in a workday; and her ability to push and/or pull with the

17

upper and lower extremities was limited due to fatigue. (Tr. 451-52). Plaintiff could never climb, balance, kneel, crouch, crawl, or stoop. (Tr. 452). She was limited in her ability to reach in all directions, handle, finger, and feel, and was limited from being in temperature extremes, humidity/wetness, around hazards, and around fumes, odors, chemicals, and gases. (Tr. 453-54).

Plaintiff was examined by Nancy Ingwell, Ph.D., on January 5, 2005 at the request of the Administration. (Tr. 464-469). Dr. Ingwell diagnosed a mood disorder and depression subsequent to medical condition with a GAF of 60. (Tr. 468-49). Dr. Ingwell opined that plaintiff had no work related limitations as a result of her mental impairments. (Tr. 470-71).

On January 8, 2005, plaintiff had a consultative physical examination with Hosam Baccora, M.D. (Tr. 472). She complained of problems with balance and coordination, right shoulder burning, numbness in the upper and lower extremities, and mild weakness in the left lower extremity. (Tr. 472). She denied blurry vision or headaches. (Tr. 472). When not having a flare-up, she indicated that she could walk for two blocks. (Tr. 472). On examination, plaintiff's station was normal, but her gait was lurching due to weakness in the left lower extremity. She could walk on her heels, but could not walk on toes. She was unable to perform tandem walking. She could squat and rise with difficulty, had normal range of motion, had negative straight leg raising, and had no inflammation or swelling in the joints. (Tr. 473). Neurological examination findings were normal, but she was unable to perform fine finger manipulation and had difficulty picking up coins with right hand and buttoning clothes with both hands. (Tr. 473). Dr. Baccora opined that plaintiff was unable to stand and walk for two hours in an eight-hour workday and that she had an impairment in carrying and handling objects. (Tr. 473-74). Dr. Baccora gave an RFC for less than sedentary work. (Tr. 476-477).

## HEARING TESTIMONY

Emily Giesel, M.D., a rheumatologist, testified at plaintiff's first hearing. Dr. Giesel testified that it was possible that plaintiff suffered from both fibromyalgia and MS. (Tr. 317). She testified that some of plaintiff's pain and fatigue was probably due to MS when she saw Dr. Chu for fibromyalgia. (Tr. 317). Dr. Giesel testified that plaintiff was likely suffering from MS all along and that she had it years before her formal diagnosis. (Tr. 317-18). She testified that it was characteristic of MS for symptoms to relapse and remit. (Tr. 320). She testified that plaintiff did not meet the listing for MS. (Tr. 321-22). Dr. Giesel opined that plaintiff would be limited to sedentary work because "repetitive activity can cause the muscle weakness and pain that is present in multiple sclerosis. But that she may have flares of multiple sclerosis which would preclude work for periods of time." (Tr. 322). Dr. Giesel stated that, through January 2001, it did not appear that plaintiff's problems were significant enough to prevent her from working. However, beginning in January 2001, after Dr. Cha documented some significant neurological abnormalities, there was more likely a possibility that plaintiff would have periods of time when she could not function adequately to hold a job. (Tr. 322). Dr. Giesel stated that she thought that Dr. Mattson's RFC opinion for less than sedentary work set forth in August 2001 was reasonable. (Tr. 323). At the hearing, the ALJ stated he accepted Dr. Giesel's testimony that plaintiff's multiple sclerosis existed as of plaintiff's date last insured of June 30, 2000. (Tr. 324).

Paul Boyce, M.D., an internist, testified at the second hearing in February 2006. (Tr. 383, 441). He testified that there was medical evidence that plaintiff suffered from MS, cervical disc disease and arthritis of the cervical neck, and fibromyalgia. (Tr. 384). Dr. Boyce testified that MS could have symptoms similar to fibromyalgia. (Tr. 384). He testified that plaintiff did not

19

meet or equal any listing. (Tr. 385). Dr. Boyce reviewed Dr. Mattson's August 2004 FCE, but stated that Dr. Mattson's examination performed at about the same time did not show severe neurologic impairments and his comparison of plaintiff's MRIs did not show progression of the MS, although there was some indication that the number of lesions may have increased over the years. (Tr. 386, 388-89). He testified that the evidence did not show physical findings that would indicate more limitations or a progression. (Tr. 386). He did note one relapse in 2002 or 2003, where plaintiff had some problems with vision, but that appeared to clear, and Dr. Boyce saw no visual abnormalities that persisted. (Tr. 387). Dr. Boyce agreed with the ALJ's assumption that plaintiff could do sedentary work. (Tr. 387-88). Dr. Boyce agreed that MS is typified by flare-ups that can last an undetermined amount of time. (Tr. 389). Dr. Boyce testified that MS flare-ups involve a variety of symptoms, including pain, hypersensitivity of certain areas of the body, difficulties with equilibrium and gait, headaches or the triggering of headaches, stability of fine finger movements, mental confusion, and vision problems. (Tr. 389-90). When asked by the ALJ if there was any "objective testing" showing flare-ups that existed for a 12 month period, Dr. Boyce testified that medical records showed consistent, recurring headaches. (Tr. 392). He testified that plaintiff did not have flare ups that existed on a recurring basis. (Tr. 393).

Georgia Ann Pitcher, Ph.D., a clinical psychologist, also testified at the second hearing. (Tr. 393, 443). She opined that plaintiff would not meet or equal a listing, and that plaintiff would not be limited to simple and repetitive work due to depression or anxiety. (Tr. 395-96).

Plaintiff testified that she experiences MS flare-ups lasting two weeks to one month about four times per year. (Tr. 399). She described these flare-ups as involving severe pain in her right arm and right leg which makes gripping and lifting impossible and causes her leg to drag. (Tr.

20

398). The flare-up also causes confusion and disorientation, and to lose her equilibrium causing her to fall. (Tr. 398, 401). She testified that two months before the hearing, she got up in the middle of the night and fell two times before she got to the bathroom. (Tr. 401). The flare-ups often involve severe headaches which make her sensitive to light and sound. (Tr. 399). Plaintiff testified that during a multiple sclerosis flare-up, she is unable to grip coins or lift things off a table, or to turn a door knob. (Tr. 400). Repetitive use of her arm during a flare-up causes exhaustion and causes her arm to give out. (Tr. 401). She testified that sometimes during a flare-up she is unable to get out of bed because she lacks strength in her arms and legs and a lot of times her legs and arms will tremble and shake. (Tr. 405). Plaintiff testified that the times she was not taking her medication is when she was living in a homeless shelter with her children. (Tr. 404-405).

## OPINION

In her pro se statement of errors, plaintiff states that her fibromyalgia and multiple sclerosis are progressive diseases which can vary depending on the degree of exacerbation. She reiterates that at times of exacerbation, she has difficulty caring for herself, and experiences a significant degree of pain, fatigue, and limitation. Plaintiff also points out that her medications cause drowsiness and confusion, which is further exacerbated by persistent insomnia.

Because plaintiff is proceeding pro se and does not identify any specific errors with the second ALJ decision currently before the Court, the Court has carefully reviewed the ALJ's decision to determine whether the ALJ's critical findings of fact were made in compliance with the applicable law and whether substantial evidence supports those findings. After a careful review of the record, the Court determines that the decision of the ALJ is not supported by

21

substantial evidence and should be reversed.

## I. The ALJ's finding that plaintiff's depression is non-severe is not supported by substantial evidence.

The ALJ's finding that plaintiff did not suffer from a severe mental impairment from 1999 through 2004 is not supported by substantial evidence.[5] A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. §404.1521(b). Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The severity requirement is a "*de minimus* hurdle" in the sequential evaluation process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

In determining plaintiff did not have a severe mental impairment, the ALJ appears to have

---

[5]The Commissioner states he limited his discussion of plaintiff's mental condition in the fact section of his brief because plaintiff did not allege any error based on her mental abilities and the Indiana District Court did not remand on this basis. (Doc. 10 at 3 n. 5). Since plaintiff is proceeding pro se and the undersigned finds the ALJ's nonseverity finding is clear error, the Court declines to limit its review as suggested by the Commissioner.

placed great weight on the fact that at her January 2005 consultative examination plaintiff denied being depressed. (Tr. 343). Dr. Ingwell, the consultative psychologist, diagnosed depression, but opined that her depression imposed no limitations on plaintiff's ability to function. (Tr. 470). Yet, even if the evidence showed that plaintiff did not have a severe mental impairment in 2005, the ALJ ignored or overlooked the substantial evidence of record showing that prior to 2005, for the period from 1999 through 2004, plaintiff suffered from depression that was more than a "slight abnormality" which would not be expected to interfere with her ability to work. *Farris*, 773 F.2d at 90.

The record is replete with evidence showing plaintiff suffered from severe depression as early as June 1999 (Tr. 264) and that her depression was more than a "slight" abnormality that affected her ability to perform work related functions from a mental standpoint. Notes from plaintiff's primary care physician indicate plaintiff's depression was treated with medication (Zoloft, Effexor, Remeron, Paxil, Klonipin) and counseling for several years, with varying degrees of success. (Tr. 264-287). The progress notes also document complaints of fatigue, anxiety, mood swings, memory loss, and insomnia. *Id.* Plaintiff attempted suicide in September 1999 and was hospitalized. (Tr. 136). She was diagnosed with a panic disorder and recurrent major depressive disorder and assessed with a GAF of 35. (Tr. 167). A reviewing state agency psychologist opined that plaintiff's mental condition "can not be non severe" and assessed plaintiff with a severe impairment. (Tr. 158). The psychologist also found the presence of a disturbance of mood evidenced by decreased energy, difficulty concentrating or thinking, and thoughts of suicide. (Tr. 161). The psychologist opined that plaintiff experienced episodes of deterioration or decompensation in work or work-like settings. (Tr. 165).

23

Plaintiff's depression diagnosis was reconfirmed in March 2000 following a psychological consultative examination. (Tr. 193). Primary treatment records from September and October 2000 show plaintiff continued to suffer from depression, insomnia, fatigue, anhedonia, and irritability, and that Zoloft was not effective. (Tr. 546-47).

In November 1999 and April 2000, state agency psychologists completed mental residual functional capacity assessments—assessments that are performed only after a finding of a severe mental impairment. These psychologists determined that plaintiff had moderate limitations in her ability to complete a normal workweek and to respond appropriately to changes in the work setting due to psychological symptoms. (Tr. 195). The psychologists also noted that plaintiff had received counseling (Tr. 215-219), was taking medication, and appeared credible. (Tr. 196). However, the ALJ failed to discuss the opinions of the state agency doctors who found plaintiff suffers from a severe mental impairment. (Tr. 158, 161, 165, 195-196).

In addition, the ALJ selectively cited to only a portion of Dr. Kareken's January 2003 neuropsychological examination showing "largely normal cognitive status"(Tr. 343, 462) while ignoring Dr. Kareken's concurrent impression of "major depression and concomitant somatization and anxiety." (Tr. 462). Dr. Kareken opined that while plaintiff did not have significant cognitive disturbance from MS, "her daily forgetfulness and inattention are driven more by marked symptoms of depression and anxiety." (Tr. 462). Dr. Kareken noted that MMPI-II scales "were remarkable for pronounced 1-2-3 profile, suggestive of profound depressive symptoms" with a "prominent amount of anxiety and nervous tension." (Tr. 462). Dr. Mattson's subsequent report from February 2004 showed plaintiff still experienced ongoing fatigue and increasing depression, and was emotionally labile on Zoloft. (Tr. 458).

24

The ALJ ignored the evidence from 1999 through 2004 showing plaintiff suffered from a severe mental impairment and instead relied on the testimony of Dr. Pitcher, the psychologist who testified at the hearing. Dr. Pitcher testified that plaintiff would not be limited to simple and repetitive work due to depression or anxiety. (Tr. 395-96). She appeared to premise her opinion primarily on the 2005 consultative examination showing no deficits of functioning. She also downplayed the significance of plaintiff's 1999 suicide attempt and assessment of a GAF of 35 by Dr. Riley, believing that Dr. Riley, as a medical doctor and not a psychologist, "improperly took the claimant's pain into consideration in the estimate of her level of function in 1999." (Tr. 344). The ALJ improperly relied on this assertion by Dr. Pitcher in the absence of any evidence to support the assertion.

Dr. Pitcher's testimony does not constitute substantial evidence that plaintiff's depression from 1999 through 2004 was not a severe impairment. All of plaintiff's treating and examining doctors during this time period, as well as the Commissioner's own state agency psychologists, reported that plaintiff suffered from depression and that her condition was severe.

The ALJ may not ignore evidence favorable to plaintiff. Rather, he must articulate the evidence accepted or rejected when making a disability finding to enable the reviewing court to engage in meaningful judicial review. *See Hurst v. Secretary of HHS*, 753 F.2d 517, 519 (1985). *See also Bailey v. Commissioner of Social Sec.*, 173 F.3d 428 (6th Cir. 1999)(unpublished), 1999 W.L. 96920; *Morris v. Secretary of Health & Human Services*, 845 F.2d 326 (6th Cir. 1988) (unpublished), 1988 W.L. 34109. "[T]he ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza v. Apfel,* 219 F.3d 378, 393 (5th Cir. 2000) (citing in part *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984)). When,

as in this case, the ALJ fails to mention rejected evidence, the Court is unable to determine if significant probative evidence was not credited or simply ignored. By overlooking or ignoring the pre-2005 evidence which supports the conclusion that plaintiff's depression constituted a severe impairment, the ALJ erred at step two of the sequential evaluation process.[6] Therefore, the ALJ's finding that plaintiff's mental impairment is non-severe is not supported by substantial evidence.

## II. The ALJ's failed to accord proper weight to the opinions and assessments of Dr. Mattson.

The ALJ failed to accord proper weight to the opinions of plaintiff's treating neurologist, Dr. Mattson. If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004); *Walters*, 127 F.3d at 530. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). In terms of a physician's area of specialization, the ALJ must generally give "more weight to the

---

[6]This finding is significant because the ALJ's finding that plaintiff could perform her past work as a secretary and other sedentary work under Grid Rule 201.29 are premised on the lack of any severe mental impairment. The ALJ may not apply the grid to meet his burden of proof in denying disability where a claimant suffers from a severe nonexertional impairment such as a mental impairment. *See Jordan v. Commissioner*, 548 F.3d 417, 424 (6th Cir. 2008); *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990); *Damron v. Secretary*, 778 F.2d 279, 282 (6th Cir. 1985).

opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5). It is well settled that a treating physician's opinion is entitled to weight substantially greater than that of either a nonexamining medical advisor or an examining physician who saw a claimant only once. *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983); *Estes v. Harris*, 512 F. Supp. 1106, 1113 (S.D. Ohio 1981).

Dr. Mattson provided two separate assessments of plaintiff's functional capacity. (Tr. 291-293, 451-454). Both indicate an ability to walk/stand for less than two hours in an 8-hour workday and to sit for less than six hours in an 8-hour workday, as well as additional limitations due to MS, fatigue, and decreased stamina. (Tr. 291-293, 451-454). In other words, Dr. Mattson opined that plaintiff had the functional capacity for less than sedentary work. (Tr. 291-293, 451-454). Dr. Giesel, the rheumatologist who testified at the first hearing, agreed that Dr. Mattson's RFC assessment was reasonable. (Tr. 323). Dr. Baccora, the consultative examiner, agreed that plaintiff could not walk/stand for two hours in a workday and that plaintiff had an RFC for less than sedentary work. (Tr. 476-477). There is no treating or examining physician who has opined that plaintiff has the functional capacity for sedentary work.

In rejecting Dr. Mattson's opinion, the ALJ relied on the opinion of Dr. Boyce, the non-examining medical expert who testified at the second hearing. (Tr. 352). The ALJ also believed that Dr. Mattson's opinion of plaintiff's functional capacity was not supported by "the other evidence of record, such as his own examination records" and that Dr. Mattson's opinion lacked "objective" support. (Tr. 352). As explained below, the ALJ's rejection of Dr. Mattson's assessment of plaintiff's functioning is without substantial support in the record.

First, the ALJ misstates Dr. Boyce's testimony. Dr. Boyce testified that he believed Dr. Mattson's August 2004 RFC opinion was not supported by his August 16, 2004 examination. (Tr. 386). The ALJ's decision, however, states that Boyce based his opinion on Mattson's 2001 RFC opinion. (Tr. 352, citing Exhibit F at 1-3 and Exhibit J at 10-11, which are Dr. Mattson's August 2001 RFC and October 2001 examination, Tr. 291-93, 531-32). This is a factual error that gives the mis-impression that plaintiff's condition in 2001 was not disabling.

In any event, the problem with Dr. Boyce's opinion, and by extension the ALJ's decision which relies on such testimony, is that Dr. Boyce's opinion is based on a comparison of Dr. Mattson's RFC assessment to a single examination when plaintiff's MS was stable and in a period of remission. Dr. Boyce's testimony ignores the relapsing nature of MS and the progress and course of multiple sclerosis recognized by Sixth Circuit precedent. Courts have long recognized that multiple sclerosis is a progressive disease for which there is no cure and which is subject to periods of remission and exacerbation. *See Parish v. Califano*, 642 F.2d 188, 193 (6th Cir. 1981). *See also Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990). While MS is not in itself per se disabling, the ALJ in evaluating a claimant with MS must consider "the frequency and duration of the exacerbations, the length of the remissions, and the evidence of any permanent disabilities." *Wilcox* , 917 F.2d at 277. The Social Security regulations likewise recognize that "[i]n conditions which are episodic in character, *such as multiple sclerosis . . .* consideration should be given to frequency and duration of exacerbations, length of remissions, and permanent residuals." 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, § 11.00(D)(emphasis added). "[W]hen a claimant with multiple sclerosis applies for social security benefits, it is error to focus on periods of remission from the disease to determine whether the claimant has the

28

ability to engage in substantial gainful employment." *Jones v. Secretary of HHS*, 35 F.3d 566 (6th Cir. 1994) (unpublished), 1994 W.L. 468033, \*\*3, citing *Wilcox*, 917 F.2d at 278; *Parish*, 642 F.2d at 193. By comparing Dr. Mattson's August 2004 RFC assessment to a single examination, Dr. Boyce failed to consider the relapsing and remitting nature of plaintiff's illness and improperly focused on a period of remission. Thus, the ALJ's reliance on Dr. Boyce's opinion was in error.

Second, the ALJ's conclusions that Dr. Mattson's assessments lacked objective support and were not supported by the evidence are without substantial support in the record.

The MRI evidence provides objective support for Dr. Mattson's diagnosis of MS. MRIs of the brain in 2001 and 2004 showed left periventricular area abnormal lesion in left middle parietal lobe and multiple lesions in the periventricular area consistent with multiple sclerosis. (Tr. 206, 458). Plaintiff's symptoms of pain, fatigue, weakness, and instability are well documented in Dr. Mattson's reports and the other medical records for the pertinent time period and are fully consistent with plaintiff's diagnosis of MS. *See Young v. Apfel*, 221 F.3d 1065, 1067 n. 3 (8th Cir. 2000) (noting symptoms of multiple sclerosis "include muscle weakness, numbness, fatigue, loss of balance, pain, and loss of bowel and bladder control"); *accord Clark v. Barnhart*, 64 Fed. Appx. 688, 691 (10th Cir. 2003).[7] *See also* Dr. Chu (July 1999): symptom complex of arthralgias, myalgias, disturbed sleep cycle, and daytime fatigue with numerous tender points consistent with a diagnosis of fibromyalgia (Tr. 187); Dr. Chu (January 2000):

---

[7]Symptoms of multiple sclerosis include: fatigue, numbness, gait, balance and coordination problems, bladder and bowel dysfunction, vision problems, dizziness and vertigo, pain, cognitive function, emotional changes, depression, spasticity, speech disorders, swallowing problems, headache, hearing loss, seizures, tremor, and respiratory problems. *See* http://www.nationalmssociety.org/about-multiple-sclerosis/symptoms/index.aspx

significant amount of fibromyalgia pain, decreased sleep, and daytime fatigue; weakness, clumsiness, numbness, and tingling, especially in the right arm and some numbness in her legs; pain down her neck and right arm different from her fibromyalgia pain; numbness down the legs especially after sitting for prolonged periods of time (Tr. 247); Dr. Chu (March 2000): pain and stiffness with range of motion; fibromyalgia not been responsive to traditional medications (Tr. 213); Dr. Cha (January 2001): gait was very unsteady and spastic, nystagmus in both eyes, right side upper and lower extremities showed diffuse weakness with increased reflex tone, left side showed hyper-reflexia, although to a lesser degree, ankle clonus bilaterally, but worse on the right (Tr. 204-205); Dr. Mattson (August 2001): episode of more discrete numbness in the right leg, right arm, and left leg two weeks earlier which lasted for two weeks (Tr. 294); Dr. Mattson (October 2001): fatigue, right leg giving out, migratory joint pain and paresthesias, depression, and memory problems (Tr. 531); Dr. Rizvi (September 2002): flare up of pain, depression, insomnia and fatigue (Tr. 547); Dr. Mattson (November 2002): exacerbation involving a subacute gait deterioration requiring a change in medication from Avonex to Rebif injections (Tr. 459, 530); Dr. Rizvi (December 2002): frontal band-like headaches that are throbbing/squeezing in nature and sleeplessness (Tr. 544); Dr. Mattson (January 2003): background headaches and neuropathic pain; neurological examination notable for bladder urgency, fatigue, and Lhermittes phenomenon (Tr. 460); Indiana Family Health Clinic Progress (February 2003): diminished strength in all extremities (Tr. 521); (March 2003): plaintiff fell and hit her left side, right arm, and left knee, experienced weakness on her right side causing a fall, pain and problems sleeping (Tr. 519); (April 2003): legs giving out and getting progressively weak, falling frequently, muscle strength diminished on exam, worse on the left lower extremity (Tr. 515); Dr. Mattick (May

2003): headache evaluation (Tr. 512); Dr. Rogers (December 2003): lower extremity pain, dizziness, lightheadedness, and feeling of disequilibrium (Tr. 506); (May 2003, August 2003, and December 2003): treatment for chronic migraine headaches (Tr. 512, 510, 507, 503); St. Vincent Hospital Emergency Department (January 2004): experienced double vision, fell, and hit head (Tr. 716-726); Dr. Mattson (February 2004): doing well until last couple of months with occasional tendency to fall, increasing headaches with nausea and photophobia, ongoing fatigue, and increased depression (Tr. 458); Dr. Mattson (August 2004): occasional right side pain, increasing and daily headaches with photophobia and nausea which kept plaintiff awake at night (Tr. 335).[8]

Nevertheless, the ALJ discredited Dr. Mattson's assessments because: (1) plaintiff's "neurological examinations have been within normal limits" (Tr. 349, citing Ex. 4F at 2, 3; Ex. 5 F at 2-6; Ex. 8F at 5-6, 12-13; Ex. A at 3-4; Ex. B at 1, 2, 5; Ex. E at 5-6, 22-23, 34-35; Ex. F at 5; Ex. 11F at 8, 9; Ex. H at 10; Ex. I at 5); (2) plaintiff's MS was described as "stable;" and (3) Dr. Mattson's reports note only one or two "flare-ups." (Tr. 349, 352).

The ALJ's string citation of "normal" neurological findings gives the appearance of overwhelming evidence that plaintiff's condition is not as limiting as Dr. Mattson has assessed. However, the citations set forth in the ALJ's decision are misleading. Three of the reports cited by the ALJ actually show *abnormal* neurological findings on examination. (Ex. A at 3-4, Tr. 204-205; Ex. B at 1, 2, Tr. 209-210; Ex. E at 34-35, Tr. 260-261). One report is of a gynecological examination for a cervical cyst with a single neurological finding ("no focal deficits") (Tr. 495)

---

[8]Remarkably, the ALJ finds the record fails to show that fatigue and lack of energy are a consistent problem. (Tr. 349). There is no substantial support for this finding as these records show.

and says little about plaintiff's functioning. Two reports are duplicates of other reports cited by the ALJ. (Compare Ex. 8F at 12-13 (Tr. 186-87) with Ex. E at 5-6 (Tr. 231-232) and Ex. 8F at 5-6 (Tr. 179-180) with Ex. E at 22-23 (Tr. 248-249)). Contrary to the ALJ's decision, these reports do not "confirm" plaintiff's neurological exams have been within normal limits and do not constitute a substantial evidentiary basis for discounting Dr. Mattson's opinions. More importantly, the ALJ failed to appreciate the relapsing and remitting nature of plaintiff's multiple sclerosis. Even though some of plaintiff's neurological exams were "normal," the record as a whole reveals plaintiff exhibited noteworthy neurological findings during various periods, as well as other findings of instability, weakness, falling, pain, and fatigue, that fully support Dr. Mattson's assessments.

In addition, the fact that Dr. Mattson assessed plaintiff's MS as "stable" is not inconsistent with his finding that her functional capacity is nonetheless limited, and does not mean that plaintiff did not experience the fatigue, decreased stamina, frequent falls, headaches, pain, and other symptoms noted throughout the record which contributed to her limited her functional capacity. "[A] person can have a condition that is both 'stable' and disabling at the same time." *Hemminger v. Astrue*, 590 F. Supp.2d 1073, 1081 (W.D. Wis. 2008) (citing *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008)). *See also Petty v. Astrue*, 550 F. Supp.2d 1089, 1099 (D. Ariz. 2008).

Finally, the ALJ failed to acknowledge Dr. Mattson's unique qualifications for assessing plaintiff's functional capacity. Dr. Mattson is a specialist in neurology and the Director of the MS Center at Indiana University who has treated plaintiff's MS for almost four years. After nearly four years of consistent treatment, and given the relapsing and remitting nature of the

32

disease, Dr. Mattson was certainly in a better position to assess the impact of MS on plaintiff's functioning than was Dr. Boyce, an internist, who is not a specialist in treating multiple sclerosis and who never examined plaintiff. In weighing Dr. Mattson's assessments, the ALJ was obligated to consider the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of Dr. Mattson, and the supportability and consistency of his opinions with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). Here, the ALJ failed to consider Dr. Mattson's specialty or Dr. Boyce's lack thereof and the other regulatory factors in assessing Dr. Mattson's opinions. Given the nature of the treating relationship between Dr. Mattson and plaintiff, his expertise and specialty in treating plaintiff's multiple sclerosis, his own findings, and the consistency of his opinion with those of Dr. Giesel, the medical expert who testified at the first hearing and who agreed that Dr. Mattson's RFC assessment was reasonable (Tr. 323)[9] and of Dr. Baccora, the consultative examiner who opined plaintiff could not perform sedentary work[10], as well as with the other medical evidence of record cited above, the ALJ erred by failing to accord proper

---

[9]The ALJ ignored Dr. Giesel's testimony from the first hearing that plaintiff's pain and fatigue was probably due to MS when plaintiff was treated by Dr. Chu for fibromyalgia. (Tr. 317). Dr. Giesel testified that it was characteristic of MS for symptoms to relapse and remit (Tr. 320) and that plaintiff likely suffered from MS all along, for years before her formal diagnosis. (Tr. 317-18). Dr. Giesel testified that "repetitive activity can cause the muscle weakness and pain that is present in multiple sclerosis" and that plaintiff "may have flares of multiple sclerosis which would preclude work for periods of time." (Tr. 322). Dr. Giesel stated that she thought that Dr. Mattson's RFC opinion for less than sedentary work set forth in August 2001 was reasonable. (Tr. 323).

[10]Dr. Baccora opined that plaintiff would be unable to perform sedentary work especially during periods of flare-ups. (Tr. 477). The ALJ rejected Dr. Baccora's opinion, believing Dr. Baccora uncritically accepted plaintiff's subjective complaints and because Dr. Baccora's conclusion was unsupported by his own clinical findings. (Tr. 352). However, Dr. Baccora's examination revealed that plaintiff's gait was lurching due to weakness in the left lower extremity, that plaintiff could walk on her heels, but not on her toes, and was unable to perform tandem walking. Dr. Baccora also reported that plaintiff was unable to perform fine finger manipulation and had difficulty picking up coins with her right hand and buttoning clothes with both hands. (Tr. 473). The ALJ failed to acknowledge these clinical findings in his decision which would account for Dr. Baccora's opinion of less than sedentary work.

deference to Dr. Mattson's opinion. *See* 20 C.F.R. § 404.1527(d)(5). Dr. Boyce's non-examining opinion does not constitute substantial evidence to reject Dr. Mattson's functional assessment. *Harris*, 756 F.2d at 435 (treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor). Thus, the ALJ's rejection of Dr. Mattson's opinions on plaintiff's residual functional capacity is not supported by substantial evidence.

**III. The ALJ's RFC finding is not supported by substantial evidence.**

The Court also finds the ALJ erred in assessing plaintiff's RFC. The ALJ determined that plaintiff has the residual functional capacity for a full range of sedentary work. Sedentary work requires the ability to lift up to ten pounds, stand or walk for up to two out of eight hours, sit for six out of eight hours during the workday, and using hands and fingers for repetitive hand-finger actions. 20 C.F.R. §§ 404.1567(a), 416.967(a); Social Security Ruling 83-10. Based on the reports of Drs. Mattson and Baccora discussed above, plaintiff does not have the physical capacity to perform the standing, walking, and sitting for sedentary work.

In addition, the ALJ erroneously determined that "there is no evidence that the claimant is unable to use her hands and fingers for repetitive hand-finger action." (Tr. 353). Contrary to the ALJ's finding, both Drs. Mattson and Baccora found limitations with plaintiff ability to use her hands for repetitive actions. Dr. Mattson determined that plaintiff cannot use her right or left hand for frequent or continual pushing and pulling of arm controls or for fine manipulations. (Tr. 292). He also found that plaintiff was able to use her hands only "occasionally" for handling (gross manipulation) and fingering (fine manipulation). (Tr. 453). Dr. Baccora opined that plaintiff was unable to use her right hand for pushing and pulling of arm controls or for fine

34

manipulations. (Tr. 476). On physical examination, Dr. Baccora noted that plaintiff was unable to perform fine finger manipulation and had difficulty picking up coins with her right hand and buttoning clothes with both hands. (Tr. 473). The ALJ's finding to the contrary is not supported by substantial evidence.

For these reasons, the Court finds that the ALJ's RFC determination is not supported by substantial evidence. Thus, the ALJ's reliance on the RFC for a full range of sedentary work to find plaintiff could perform her past work as a secretary and to find other sedentary work in the local and national economy based on Grid Rule 201.29 is without substantial support in the record. Accordingly, the Court finds the ALJ's decision is not supported by substantial evidence and should be reversed.

**IV. This matter should be remanded for an award of benefits.**

This matter should be remanded for an award of benefits. "[A]ll essential factual issues have been resolved and the record adequately establishes . . . plaintiff's entitlement to benefits." *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). As discussed above, based on the residual functional capacity assessments of Drs. Mattson and Baccora, plaintiff does not have the capacity for even sedentary work. The only question in this case is the appropriate onset date of disability. Social Security Ruling 83-20 provides that when impairments are progressive in nature, the Commissioner must "infer the onset date from the medical and other evidence that describes the history and symptomology of the disease process." *In accord Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989). Dr. Giesel opined that plaintiff's pain and fatigue were probably due to MS

35

when she was treated by Dr. Chu for fibromyalgia and that plaintiff likely suffered from MS years before her formal diagnosis in January 2001. (Tr. 317-18). Plaintiff began exhibiting signs of MS at least by her January 2000 examination with Dr. Chu, if not before. (Tr. 247).[11] Thus, there is strong evidence that plaintiff's disability began before her insured status lapsed on June 30, 2000. However, since the determination of the onset date of disability is a factual issue, this matter should be remanded solely for a determination of the appropriate onset date and an award of benefits.

### IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED pursuant to Sentence Four of 42 U.S.C. § 405(g) consistent with this opinion and remanded for a determination of the appropriate onset date and an award of benefits.

Date: _4/14/09_

Timothy S. Hogan
United States Magistrate Judge

___

[11]Dr. Chu reported a significant degree of fibromyalgia pain, decreased sleep, and daytime fatigue, a great deal of upper extremity pain, occasional weakness, clumsiness, numbness, and tingling of the right arm, and numbness down the legs. Plaintiff also reported there were times when she woke up in the morning feeling that she could not move at all. These signs and symptoms are fully consistent with her eventual diagnosis of MS.